FILED

2026 Mar-24  AM 10:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ALEXIS SANKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-01117-SGC |
| | ) | |
| CHILDREN'S HOSPITAL OF | ) | |
| ALABAMA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION[1]

The plaintiff, Alexis Sankey, claims she was discriminated against because of her race in violation of Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e to § 2000e-17. (Doc. 1).[2] The defendant, Children's Hospital of Alabama, Inc., has moved for summary judgment. (Docs. 23-25). Its motion is fully briefed and ripe for review. (Docs. 26-28). For the reasons stated below, the court will grant Children's Hospital's summary judgment motion.

## I.  Standard of Review

Under Rule 56 of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions

---

[1] The parties have unanimously consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Doc. 9).

[2] Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: (Doc. __ at __).

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, the non-moving party must go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome of the case will preclude summary judgment. *Id.* All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

2

## II. Undisputed Facts

### A. Background

Sankey is an African American female who worked for Children's Hospital from July 19, 2021, until her termination on September 29, 2022. (Doc. 25-3 at 2). More specifically, Sankey worked for the Development Operations Group, a part of the Foundation and Development Department, which raised funds for Children's Hospital through gathering and administering charitable pledges. (Doc. 25-5 at 2).

During Sankey's employment, the Development Operations Group included Development Operations Manager Tammy Fields, Operations Supervisor Stefanie Blakely, Coordinator Operations Digital Communications Cheynne Cook, and Sankey. (Doc. 25-3 at 3). Fields reported to Coke Matthews, Children's Hospital Chief Development Officer. (Doc. 25-5 at 3). By the end of her employment with Children's Hospital, Sankey reported to Blakely, who, in turn, reported to Fields. (*Id.* at 3).

Before working at Children's Hospital, Sankey had extensive database experience, including experience using fundraising database programs such as Raiser's Edge, the fundraising program used by the defendant. (Doc. 25-1 at 18, 20). Sankey previously worked in development at the YMCA of Central Alabama, which also used Raiser's Edge. (*Id.* at 20). Sankey is a Blackband Certified Raiser's Edge Professional. (*Id.*).

3

After four, in-person interviews with staff in the Development Operations Group, Sankey was offered the Development Operations Data Coordinator position with an annual base pay of $44,000 ($21.15/hour), plus benefits. (*Id.* at 25; Doc. 25-3 at 3, 18). This was an hourly position. (Doc. 25-1 at 39). Sankey was initially told the position could pay as much as $60,000 yearly; however, after she resigned from her prior position, she learned her salary would only be $44,000. (*Id.* at 22-23).

According to a June 2021 email exchange between Children's Hospital Human Resources Representative Tara Davis and Fields, Sankey told Davis during her interview that Sankey sought a minimum salary of $45,000. (Doc. 27-9). In the email exchange, Davis told Fields that another Development Operations employee, Cheyenne Cook, was paid $40,000 but Davis did not believe Sankey would accept less than $40,000 per year. (*Id.*). Fields responded, "Wow! I know she has the experience but I can't see paying her 5k more than Cheyenne, I mean she has the experience too now after 2 years. Ugh. What's the mid-range for this job?" (*Id.*).

As the Development Operations Data Coordinator, Sankey was responsible for maintaining accurate data regarding donors and gifts, generating donor reports, making copies of donations and deposits, entering gifts into and maintaining the database, reconciling associated transactions, and preparing and sending donation receipts. (Doc. 25-1 at 30-31; Doc. 25-4 at 3). Sankey prepared printed receipts by

manually "stuffing" and mailing them to donors to confirm gifts and provide appropriate tax documentation. (Doc. 25-1 at 30, 33; Doc. 25-4 at 3).

While Sankey normally worked on-site, she occasionally performed some work at home. The only tasks she performed at home were making Raiser's Edge batch entries and stuffing receipts.[3] (Doc. 25-1 at 37). Unless she was stuffing receipts, Sankey had to log into Children's Hospital's IT system or the Raiser's Edge database. (Doc. 25-5 at 3; Doc. 25-1 at 33, 84).

During Sankey's employment, Children's Hospital used Infor Workforce Management ("WFM") to manage timekeeping. (Doc. 25-3 at 4). This system allowed employees to electronically clock in and out using computers or mobile devices. (*Id.*; Doc. 25-1 at 40). WFM captured the geographic location of the device the employee used to log her time if the employee used a cellular-enabled device, such as an iPhone, to clock in or clock out. (Doc. 25-3 at 4; Doc. 25-1 at 40). WFM also permitted a manager to manually input an employee's time when the employee failed or forgot to input the time. (Doc. 25-3 at 5).

### B.  Review of Sankey's Performance and Time Entries

During her employment, Sankey often used WFM on her iPhone to clock in and clock out. (Doc. 25-1 at 40; Doc. 25-3 at 4). When she occasionally encountered

---

[3] This involved placing receipts into an envelope and took a maximum of one minute per receipt. (Doc. 25-1 at 33).

issues with the WFM system or forgot to clock out, Sankey would ask Fields to manually input her time. (Doc. 25-1 at 41-43). On some occasions when Sankey had not entered her time, Fields had to ask Sankey to send her time, so Fields could enter it for payroll purposes. (Doc. 25-5 at 3; Doc. 25-1 at 110).

At some point before August 2022, Fields became concerned that Sankey's productivity did not meet the number of hours she reported working, particularly given Sankey's prior experience working with Raiser's Edge. (Doc. 25-5 at 3). On August 1, 2022, Fields and Sankey met to discuss these issues. (*Id.* at 49-50, 80; Doc. 25-5 at 3). Fields covered several topics during this meeting, including:

- She believed Sankey was not working a full 40 hours each week and was instead using paid time off ("PTO") to reach her hours.[4] Fields told Sankey she must work forty (40) hours per week moving forward;

- Sankey's response time to emails was too slow;

- Sankey had general productivity issues and had been observed watching podcasts during work hours. Sankey denied watching podcasts and told Fields she was listening to NPR; and

- Blakely was being promoted to Supervisor of Development Operations.

(Doc. 25-1 at 49-50; Doc. 25-5 at 4). In response to the concerns about productivity, Sankey asked Fields "where the rest of [Sankey's] job was, because [she] couldn't be eight hours of productive when receipts [or checks] only [came] in at the end of the day." (Doc. 25-1 at 49). During this meeting, Sankey alleges Fields suggested

---

[4] Children's system applies PTO to make up the gap between the hours actually worked and 40 hours per week. Doc. 25-1 at 195:6-14; Doc. 25-5 at 4).

Sankey should leave the Development Operations Group and told Sankey "the hospital doesn't pay for discrimination." (*Id.* at 49).

On August 11, 2022, the Development Operations Team implemented a flexible schedule policy. (*Id.* at 53; Doc. 25-5 at 4). The team's core hours would be 8:30 AM to 2:30 PM, during which employees were expected to be present and available for departmental communications and responsibilities. (Doc. 25-1 at 53; Doc. 25-5 at 4). Outside of the core hours, employees were not required to remain at the workplace and had the option to "flex" their schedule and clock out to attend to personal matters and later resume their work remotely. (Doc. 25-1 at 53-54; Doc. 25-5 at 4). Before this, Development Operations employees, including Sankey, needed a supervisor's permission to work remotely unless they had already completed their normal weekly hours; however, employees, including Sankey, were regularly approved to work from home if personal circumstances warranted. (Doc. 25-3 at 5; Doc. 25-5 at 4; Doc. 25-1 at 47, 52-53).

After the August 1, 2022 meeting between Sankey and Fields, Fields and Blakely continued to question Sankey's performance and attendance. (Doc. 25-4 at 5; Doc. 25-5 at 5). They observed Sankey often arrived late and/or was not otherwise present at work. (Doc. 25-4 at 5; Doc. 25-5 at 5). They were also concerned Sankey was not logged into Children's Hospital's IT systems, including Raiser's Edge, while on the clock. (Doc. 25-5 at 5).

On September 19, 2022, Fields and Blakely consulted with Davis to determine whether they could terminate Sankey because of poor work quality, errors, and their belief that Sankey's production fell short of the number of hours she reported working. (Doc. 25-4 at 5; Doc. 25-5 at 5; Doc. 27-8). Fields provided Davis with the following examples:

- On September 12, 2022, Sankey clocked in at 8:54 a.m. and out at 6:36 p.m., but she only completed work that took approximately two hours.

- On September 13, 2022, Sankey clocked in at 8:54 a.m. and out at 7:36 p.m., but she only completed work that took approximately one hour.

(Doc. 25-5 at 11). Davis told Fields and Blakely that Children's Hospital would need to adhere to its progressive discipline policy for these issues. (Doc. 25-5 at 10).

Davis then requested, and later shared with Fields, a report of Sankey's employee badge activity provided by Children's Hospital's Security Department.[5] (Doc. 25-3 at 6). Fields compared Sankey's badge activity to her time records and identified several discrepancies. (Doc. 25-5 at 6). Sankey often used her badge to exit the parking deck in her vehicle, but the geo-location feature of WFM indicated she later clocked out from home. (*Id.*). Sankey also sometimes clocked in from home before commuting to Children's Hospital's premises or clocked in during her

---

[5] Children's Hospital issues its employees an employee identification badge that is used, among other things, to access Children's Hospital's parking garages, buildings, and elevators. (Doc. 25-1 at 26; Doc. 25-3 at 3). Children's Hospital maintains electronic records of timeclock and badge activity of its employees. (Doc. 25-3 at 3).

commute. (*Id.*). Fields confirmed Sankey was not logged into Children's Hospital's IT systems during the times she was clocked in but not on Children's Hospital's property. (*Id.*).

Fields told Davis about these discrepancies, and Davis independently verified the information. (Doc. 25-3 at 6). Davis compared Sankey's August 2022 and September 2022 clock-in and clock-out times to her parking garage entry and exit records to determine whether Sankey was sometimes on the clock but not present at Children's Hospital. (*Id.* at 8). In performing this analysis, Davis excluded and/or attempted to exclude dates where Fields manually input and/or edited Sankey's time. (*Id.*). Davis ultimately concluded Sankey had sometimes (1) clocked in from home or while commuting to Children's Hospital and (2) clocked out at home after badging out of the parking garage, both of which suggested Sankey was reporting to have worked time when she was commuting or otherwise not working. (*Id.*). These discrepancies occurred on more than 15 occasions, with some periods being more substantial (i.e., exceeding three hours) while others suggested a typical commute (e.g., 33 minutes on August 15, 2022).[6] (*Id.* at 7). Davis prepared a chart of the time discrepancies. (*Id.* at 7, 98-99).

---

[6] Sankey's commute between her home and Children's was approximately 15 minutes, and traffic was not typically a variable in that time. (Doc. 25-1 at 41).

Children's Hospital's policies prohibit employees from improperly reporting to have worked time they did not work. (Doc. 25-3 at 7, 102). An employee's failure to accurately record time is "[c]ause for immediate termination of employment without warning." (*Id.* at 102). Sankey was aware of this policy. (Doc. 25-1 at 71).

According to Sankey, Fields instructed her to refrain from clocking out when taking 15-minute breaks. (Doc. 25-1 at 55). Additionally, Sankey was responsible for mailing receipts, and she often did this during her commute by delivering the mail to a mailbox outside Children's Hospital. (Doc. 27-1). Further, Fields, and later Blakely, sometimes told Sankey to go home without clocking out on days surrounding holidays and other occasions. (Doc. 25-1 at 55-56).

On September 26, 2022, Davis, Fields, and Blakely met with Sankey to ask about the time keeping discrepancies. (Doc. 25-1 at 57-60; Doc. 25-5 at 7). Sankey admitted she clocked in and out at the times and locations evidenced by the time clock system, including departing the parking garage without clocking out. (Doc. 25-1 at 58-59, 71 Doc. 25-3 at 7). She denied, however, ever leaving the parking deck without clocking out before the flexible work schedule was implemented in August 2022. (Doc. 25-1 at 59; Doc. 25-3 at 7). While Sankey denied knowing it was wrong to be paid for her commute time, she admitted she "knew it was off." (Doc. 25-1 at 65). The flexible work arrangement did not allow employees to remain on the clock for commute time or for hours they were not working. (Doc. 25-3 at 8;

Doc. 25-5 at 7). Sankey has no knowledge of when other Children's Hospital employees clocked in and out. (Doc. 25-1 at 98).

After the September 26 meeting, Davis obtained Sankey's badge activity for June and July 2022 and compared those records with Sankey's time clock activity.[7] (Doc. 25-3 at 8, 107-12). Davis determined, despite Sankey's representations at the September 26 meeting, she had departed work several times in June and July without clocking out. (*Id.* at 8). Davis prepared a chart of Sankey's June and July time discrepancies. (*Id.* at 8, 114-15).

Davis's review consisted only of database activity, and she was not sure that review captured the entirety of Sankey's work. (Doc. 25-6 at 4*.)*. Davis conceded the review she conducted did not account for Sankey's work stuffing receipts. (*Id.*). Children's Hospital did not investigate the timekeeping practices of any other Foundation Operations employee, including Cook and Blakely. (Doc. 25-6 at 22). Further, Davis is not aware of any other periodic review of the Development Operations' employee time entries during 2021 and 2022. (*Id.*).

Sankey contends Davis reviewed her time entries only to substantiate a suspicion of time discrepancies. (*Id.* at 33; Doc. 26 at 4). Sankey complains there is no evidence Davis, or anyone else, reviewed her email activity, and Davis acknowledged she could not determine what other work Sankey may have been

---

[7] Davis did not review Sankey's time entries before June 2022. (Doc. 25-3 at 8).

performed that did not involve Children's Hospital databases. (Doc. 25-6 at 33). Sankey also claims a technical issue with the timekeeping system caused her time entries to reflect that she did not clock out before leaving the parking deck. (Doc. 25-1 at 40).

### C. Sankey's Termination

Children's Hospital terminated Sankey's employment effective September 29, 2022. (Doc. 25-3 at 8). Sankey was given a report stating she was terminated because of discrepancies with her time entries. (Doc. 25-1 at 70; Doc. 25-2 at 5; Doc. 25-3 at 8). After she was informed her employment had been terminated, Sankey "joked" with Blakely that the termination was "a heck of a birthday present" and told her she felt she had been the victim of racial discrimination since starting employment at Children's Hospital. (Doc. 25-1 at 65). Blakely said she was sorry Sankey felt that way, and Sankey responded, "I wonder if I explain this to the EEOC, would they just be sorry to hear that, like you are." (*Id.*). According to Children's Hospital, this was the first occasion Sankey mentioned race discrimination. (Doc. 25-4 at 6; Doc. 25-3 at 8).

Sankey appealed her termination decision through Children's Hospital's Administrative Review process. (Doc. 25-3 at 9). She argued "[h]ad there been a problem, [she] should've been given an opportunity to fix it . . ." and, testified at her deposition that "in regards to the clock-ins, [she] didn't feel that was something [she]

had done with malice or intent at all." (Doc. 25-1 at 73). Sankey's termination was upheld, and her employment was not reinstated. (Doc. 25-3 at 9; Doc. 25-7 at 1).

### D. Alleged Discrimination

Sankey was the only African American employee in the Development Operations Group. (Doc. 27-3 at 2). She identified only one comment she believed was race-related, made by Fields sometime in early 2022. (Doc. 25-1 at 77). As Fields's hair was regrowing following chemotherapy treatment, Fields remarked she hated that her hair was curly and would "need to start asking [Sankey] for hair products." (*Id.*). Sankey's natural hair is curly, though she usually wore it straight while working for Children's Hospital. (*Id.* at 77-78). When asked why she interpreted Fields's comment as "racial," Sankey replied:

> A. She said she hated her hair that way. And to look at the only black employee in the building and not have any direct visual that my hair is kinky but to call that out as something that—that I know exclusively about being curly, I don't—have a bad relationship with my hair being curly. I just need it to be manageable.
>
> But she did have a bad relationship with it and specifically hated it and related curly hair to me because I was black.
>
> Q. Well, you have straight hair, right?
>
> A. I mean, here today, yes.
>
> . . .
>
> Q. And did you have straight hair when you were working at Children's?
>
> A. For the most part. But I did sometimes wear my hair natural. I didn't really like the experience too much, so I didn't wear it natural too much.

Q. I mean, women can have preferences about how they're going to wear their hair, right?

A. I mean, unless you're a black woman, and sometimes you get treated differently based on that.

Q. Well, did she say anything about you being black and wanting your help with her hair because you're black?

A. She implied that it was because I was black that she needed my hair products. She didn't ask the other white employee we were talking to. She said she needed my products.

Q. Right. But you had the straight hair, and that's what she wanted, right?

A. I guess so.

(*Id.* at 78). Sankey did not report this comment to Children's Hospital. (*Id.*). She does not think Fields believed the comment was racially offensive, but she also stated Fields "did a lot of things I don't think she realized were offensive by race . . ." (*Id.*). For example, Fields's office contained a vase holding cotton branches that sat on top of a white "plantation" column. (*Id.* at 10-11). Sankey thought this was "weird" and "risqué" and interpreted the decoration as an antebellum display. (*Id.*).

Sankey believes Cook and Blakely, both of whom are Caucasian, were treated more favorably than her. (*Id.* at 71). Sanky initially "thought that [Blakely] and [Cook] were salaried employees because they were both never at work. And so initially they were telling [her she] couldn't be as flexible because of being hourly." (*Id.* at 72). Sankey also claims Cook was given Sankey's duties so Cook could work remotely while pregnant and that Sankey assumed Cook's prior responsibilities upon

14

Sankey's hiring. (*Id.* at 49, 73). She also generally complains Cook was given more flexibility with her schedule. (*Id.* at 82).

Cook was hired by Children's Hospital in September 2019 and remained employed with Children's Hospital as of August 2025. (Doc. 25-3 at 9). She had no record of issues with productivity, performance, attendance, or timekeeping. (*Id.*; Doc. 25-5 at 8). Blakely was hired by Children's Hospital on or about October 21, 2013, and remained employed as of August 2025. (Doc. 25-3 at 9). Blakely had ten years of experience in development before being hired by Children's Hospital. (Doc. 25-4 at 6). Blakely had no record of issues with productivity, performance, attendance, or timekeeping. (Doc. 25-3 at 9; Doc. 25-5 at 8).

Sankey never saw "anyone else being trumped for having headphones in and then being required to express what's playing on those headphones and then being penalized for what was playing on those headphones." (Doc. 25-1 at 84). She also complains she did not have enough work to fill eight hours a day. (*Id.* at 49).

Sankey filed a complaint with the Equal Employment Opportunity Commission. (Doc. 1 at 2). After receiving a right-to-sue notice, she filed this action on August 14, 2024, asserting claims for race discrimination and retaliation. (Doc. 1).

## III. Analysis

Children's Hospital contends Sankey cannot prove her claim for race discrimination because (1) Cook and Blakely are not proper comparators and thus Sankey cannot establish a prima facie case of racial discrimination, and (2) Sankey cannot establish Children's Hospital's proffered reason for her termination—time-theft—was pretext for racial discrimination. It further argues Sankey's retaliation claim fails because she concedes she did not engage in protected activity before her termination and because she cannot show her termination was pretext for retaliation. Sankey does not oppose the dismissal of her retaliation claim, but she argues she has presented a triable issue of fact precluding summary judgment on her discrimination claim. (*See* Doc. 26 at 15).

### A. Race Discrimination

#### 1. Framework

Title VII makes it unlawful for an employer to refuse "to hire . . . or otherwise to discriminate against any individual [] because of such [individual's] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Sankey cites no direct evidence of her discrimination claim.[8] Therefore, she must rely on indirect evidence

---

[8] "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of [an impermissible factor] will constitute direct evidence of discrimination." *Damon v. Fleming Supermarkets Of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (internal quotation marks omitted); *compare Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 855 (11th Cir. 2010) (noting the Eleventh Circuit has held that documents stating " 'Fire Early – he is too old'" and " ' Fire Rollins – she is too old'" constitute direct evidence of discrimination), *with Tomczyk v. Jocks & Jills Restaurants, LLC.*, 198 F. App'x 804, 810 (11th Cir. 2006) (holding that use of

of discrimination. One way she may show discriminatory intent through circumstantial evidence of discrimination is via the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1217 (11th Cir. 2019). This is a three-step evidentiary tool that establishes an order of proof and production. *See Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023). First, the plaintiff must establish a "legal mandatory, rebuttable presumption" of intentional discrimination by showing (1) she belongs to a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the job in question; and (4) she was treated less favorably than another employee, outside her protected class, who was similarly situated in all material respects. *See id.* A plaintiff who presents this prima facie case is entitled to a rebuttable presumption of intentional discrimination. *Id.* The employer may then rebut that presumption by offering evidence of a legitimate, nondiscriminatory justification for the adverse action.[9] *Id.* If the

---

racially derogatory comments not directly linked to decision to terminate plaintiff served as circumstantial evidence of discrimination at best).

[9] This is a burden of production rather than of proof, and it can involve no credibility determination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). "It is important to bear in mind, however, that the defendant's burden of rebuttal is exceedingly light; the defendant need not persuade the court that it was actually motivated by the proffered reasons [but] it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983) (internal citations and quotations omitted). So long as the employer articulates a "clear and reasonably specific" nondiscriminatory basis for its actions, it has discharged its burden. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981).

employer offers that justification, the plaintiff must then show not only that the employer's justification was pretextual but also the real reason for the adverse action was impermissible discrimination.[10] *Id.* A plaintiff can show pretext by casting sufficient doubt on the employer's proffered reasons to permit a reasonable factfinder to conclude some other reason actually motivated its conduct. *Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994).

A plaintiff is not limited to the *McDonnell Douglas* framework; instead, she will always survive summary judgment if she presents circumstantial evidence that creates a triable issue of fact concerning the employer's intent—often called the "convincing mosaic" standard. *Tynes*, 88 F.4th at 946. As explained in *Tynes*, the *McDonnell Douglas* evidentiary framework is not

> a stand-in for the ultimate question of liability in Title VII discrimination cases. . . . Properly understood, *McDonnell Douglas* is an evidentiary framework that shifts the burden of production between the parties to figure out if the true reason for an adverse employment action was the employee's [protected characteristic.] It is not a set of elements that the employee must prove—either to survive summary judgment or prevail at trial.

*Id.* at 939. *Tynes* further noted that a plaintiff's failure to produce a comparator does not necessarily doom her case because she will "always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the

---

[10] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot quarrel with the wisdom of the reason but instead must "meet that reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

employer's discriminatory intent"—in other words, she can proceed through the convincing mosaic standard even if she cannot meet all portions of the *McDonnell Douglas* framework. *See id.* (internal citations and quotations omitted). "A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action— the ultimate inquiry in a discrimination lawsuit." *Id*. A plaintiff "may point to any relevant and admissible evidence." *Id.* at 946, n.2. Per the Eleventh Circuit's caselaw, "'no matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'" *Id.* (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Probative evidence may include (1) suspicious timing, ambiguous statements, or other evidence from which discriminatory intent may be inferred; (2) systematically better treatment of similarly situated employees; and (3) pretext. *Id.*

In December 2025, after the parties completed briefing on Children's Hospital's summary judgment motion, the Eleventh Circuit issued its decision in *Ismael v. Roundtree*, 161 F.4th 752 (11th Cir. 2025). *Ismael* counseled courts to focus not on the defendant's proffered reason for an adverse action but on whether the plaintiff has put forth evidence tending to demonstrate discrimination was the true reason for the adverse action:

To show pretext, a plaintiff must show *both* that the employer's reason was false, *and* that discrimination was the real reason for the adverse action. . . . The latter requirement unquestionably holds the same focus as the convincing mosaic standard. The former, however, does not. Requiring a plaintiff to negate the defendant's explanation on summary judgment has at least two defects. First, it is not required to succeed at trial. Second, it detracts from the plaintiff's affirmative case that the driving cause was illegal discrimination or retaliation.

. . .

Moreover, focusing on the defendant's justification can lead both litigants and the court down a rabbit hole that obfuscates the plaintiff's affirmative claim. This is precisely what we sought to avoid when we adopted the convincing mosaic standard. . . . In *Tynes*, we emphasized that, at summary judgment, we ask only one question: whether there is sufficient evidentiary basis for the jury to find that the defendant intentionally discriminated against the plaintiff. . . . These questions appropriately frame the inquiry on the plaintiff's asserted theory of the case. By contrast, the pretext inquiry lets the defendant's explanation take center stage, requiring the plaintiff to present contradictory evidence rather than direct or circumstantial evidence supporting an inference of discrimination.

Surely, the plaintiff might find it useful to attack the defendant's account. Evidence that their explanation is untruthful, inconsistent, or that the alleged conduct was not typically punished may all be probative of malfeasance. But, as we have explained before, the entire evidentiary picture goes further than pretext. . . . Our precedent specifically describes evidence of pretext as *a subset* of potentially relevant circumstantial evidence.

*Id.* (internal quotations and citations omitted; alterations adopted). Further, when a defendant successfully rebuts a plaintiff's prima facie case of discrimination, the *McDonnell Douglas* framework is no longer relevant, and the court should proceed to ask whether the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence to permit a jury to infer intentional

20

discrimination. *Id.* at 764. Even when a plaintiff cannot establish a prima facie case, she does not automatically lose on summary judgment but instead must simply "produce enough evidence, on her own and without any helpful evidentiary burdens or presumptions, to demonstrate a material issue of triable fact. A court should, therefore, advance directly to the convincing mosaic inquiry." *Id.*

As this court understands *Ismael*, the two arguments Children's Hospital advances—Sankey cannot establish a prima facie case or that Children's Hospital's reason for her termination was pretext for race discrimination—would not entitle it to summary judgment unless Sankey has also failed to put forth enough evidence for a jury to find in her favor on the ultimate question of discrimination. *See id.* at 763. In other words, the only dispositive inquiry is whether Sankey has put forth "enough evidence for a reasonable factfinder to infer" discriminatory intent. *See id.; Tynes*, 88 F.4th at 946. The court therefore declines to address Children's Hospital's *McDonell Douglas* arguments and will proceed directly to the question of whether Sankey has produced a convincing mosaic of discriminatory intent.[11]

---

[11] *Ismael* also suggests the *McDonnell Douglas* framework plays little—if any—role at summary judgment: "Though we lack clarity from the Supreme Court regarding *McDonnell Douglas*' appropriate role—if any—at summary judgment, we reaffirm that it is not the only game in town, and that it does not supplant Rule 56." *Ismael*, 161 F.4th at 763. *Ismael's* summary judgment "roadmap" for district courts suggests *McDonell Douglas* matters only where a plaintiff establishes a prima facie case and the defendant fails to proffer evidence of a legitimate basis for termination. *Id.* at 764. In such cases, the plaintiff would be entitled to summary judgment. Otherwise, *McDonnell Douglas* "'simply drops out of the picture.'" *Id.* (quoting *Hicks*, 509 U.S. at 510).

21

## 2. Convincing Mosaic

As stated above, a "'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit." *Tynes*, 88 F.4th at 939. In other words, the court "must consider the totality of a plaintiff's circumstantial evidence on summary judgment." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023). The "evidentiary picture may include, 'among other things,' (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Id.* at 1342 (citing *Lewis*, 934 F.3d at 1185). When viewed in the light most favorable to the plaintiff, Sankey's evidence does not satisfy this standard.

In opposing Children's Hospital's motion for summary judgment, Sankey mainly argues she did not engage in time theft. This, however, is not enough to overcome summary judgment. Instead, Sankey must put forth some evidence suggesting her race played a role in her termination. She has not done so.

22

Sankey contends that because she was the only African American employee in the Development Operations Group,[12] a jury could interpret the following evidence as a convincing mosaic of race discrimination:[13]

- Fields made the following racially discriminatory remarks: (1) in early 2022, she suggested she might ask Sankey for hair product recommendations; and (2) on August 1, 2022, she told Sankey Children's Hospital doesn't pay for discrimination claims;

- Cook was treated better than Sankey because (1) Davis suggested Sankey should be paid similarly to Cook; (2) Cook had more schedule flexibility; and (3) Cook was not penalized when Fields "fixed" her time;

- Other Development Operations employees were not reprimanded for using headphones; and

- Children's Hospital did not review Cook's or Blakely's time entries.

Sankey offers little analysis of these facts and instead simply asserts this establishes a convincing mosaic of race discrimination. Despite this conclusory argument, the court has analyzed this evidence in the same manner it would treat any other case, "jumping directly to the ultimate question of liability and deciding whether the moving party is entitled to judgment at that stage of the case." *See Tynes*, 88 F.4th

---

[12] As noted above, the Development Operations Group consisted of three other people: Fields, Cook, and Blakely, all of whom are Caucasian.

[13] At her deposition, Sankey complained Field's office contained a vase of cotton branches that sat on top of a column. Sankey does not cite this as evidence supporting her claim, and in any event, there is no evidence the vase of cotton branches was directed at Sankey specifically. The court therefore declines to address it further.

at 947. In doing so, it finds Sankey's evidence does not establish a convincing mosaic of race discrimination.

First, Sankey has not demonstrated Fields's comments were related to the termination decision. While racial remarks that "are either too remote in time or too attenuated" from the employment decision are not direct evidence of discrimination, such comments may provide circumstantial evidence of discrimination. *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998). However, such statements are generally insufficient "absent some additional evidence supporting a finding of pretext." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir. 2002)). For example, in *Rojas v. Florida*, a decisionmaker's comment to a woman at the company, who was not the plaintiff, that she did not deserve her job because she was a woman was too "isolated and unrelated to the challenged employment decision" to by itself be evidence of pretext. 285 F.3d 1339, 1343 (11th Cir. 2002). And in *Coleman v. Morris-Shea Bridge Co., Inc.*, the court found that comments from a supervisor who said the plaintiff "had a strike against [him] because [he] was black" and "told [the plaintiff] about not becoming [n-word] rich" were insufficient to show discriminatory intent because they were made years before and were not related to the plaintiff's termination. No. 21-13764, 2026 WL 551909, at *8 (11th Cir. Feb. 27, 2026).

Here, Fields's comment about asking Sankey for hair recommendations was made months before any issue concerning Sankey's performance, and there is no indication whatsoever that it was related to Sankey's termination. As to Fields's comment that Children's Hospital does not pay for discrimination claims, Children's Hospital characterizes this evidence as showing "Fields was caustic toward everyone, not just" Sankey. (Doc. 28 at 11). The court is not persuaded by this argument, as it was made during a meeting to discuss Sankey's performance, and as best the court can tell from the record, Sankey alleges the comment was spontaneous rather than responsive to something Sankey said. Nevertheless, Sankey does not contend this comment was made in relation to her alleged time theft.

Second, Sankey's claim that Fields treated Cook systematically better than Sankey is not supported by the record. The June 2021 email about Sankey's potential salary has no suggestion that race played a role. Instead, it discusses only whether Fields was willing to pay Sankey $5,000 more than Cook, who Fields stated had similar experience to Sankey. Further, Sankey was ultimately paid more than Cook. While Sankey alleges Cook had a more flexible schedule, there are no specific facts to support this conclusory claim, nor is there any evidence that Sankey sought but was denied requests for a more flexible schedule or to work from home.[14]

---

[14] It is not clear whether Sankey is complaining Cook was given more flexibility during Cook's pregnancy. At her deposition, Sankey testified that during Cook's maternity leave, Cook was given Sankey's tasks so she could work remotely, and Sankey was given Cook's on-site tasks. (Doc. 25-

Additionally, Sankey cites no evidence showing she suffered any adverse consequence on the occasions when Fields input her time, so claims that Fields also fixed Cook's time without consequence are not probative of disparate treatment.

Regarding headphone usage, Sankey does not identify which other Development Operations employees purportedly used headphones, nor does she cite evidence establishing this as fact. Moreover, the record does not suggest Sankey suffered any adverse consequence for using headphones. Instead, the evidence reflects that during a meeting to discuss Sankey's apparent lack of productivity, Fields questioned whether Sankey was watching podcasts while at work.

Finally, Sankey's complaint that Children's Hospital only reviewed her time entries, but not those of Cook or Blakely, does not suggest discriminatory intent. She has presented no evidence that Fields had any productivity concerns with Cook or Blakely or suspected they were reporting to have worked more hours than they actually worked. Sankey's argument seeks to impose on Children's Hospital an obligation to review all employees' time entries to avoid suggesting racial animus. Absent authority supporting this proposition, the court declines to find this suggestive of racial discrimination.

---

1 at 49). Sankey, however, agreed this flexibility was related to Cook's pregnancy and subsequent maternity leave. (*Id.*).

These facts stand in contrast to those in *Jenkins v. Nell*, in which the plaintiff (white) was fired after he told his supervisor, Nell (black), in a serious tone to get out of his face. 26 F.4th 1243, 1248 (11th Cir. 2022). He never apologized for the comment. *Id.* at 1247. Another employee, Jones (black), used a joking tone to threaten Nell but later apologized. *Id.* at 1250. The district court granted summary judgment in favor of Nell, finding Jenkins failed to present a prima facie case of race discrimination under either the *McDonnell Douglas* or convincing mosaic frameworks because he had not produced a proper comparator, demonstrated the given reason for his termination was pretextual, or presented a convincing mosaic of race discrimination. *Id.* at 1248.

On appeal, the Eleventh Circuit agreed Jones was not a proper *McDonnell Douglas* comparator "because the circumstances surrounding [Jones's] misconduct were not the same or substantially similar as Jenkins." *Id.* at 1250. Nevertheless, the court found Jenkins presented a convincing mosaic of evidence because (1) Jones committed a violation similar to the violation Jenkins committed; (2) many white employees retired, resigned, or transferred from the department after Nell took over; (3) there was evidence of Nell's mistreatment of three white employees; (4) Nell had a "close" relationship with human resources; (5) Nell made racially biased comments about white employees; (6) Jenkins had not changed the substance of his report about an accident when Nell asked him to do so; and (7) Nell provided

changing explanations for Jenkin's termination. *Id.* The court specifically noted that even though Jones was not a strict comparator, evidence about his behavior was relevant. *Id.* at 1251.

The facts here fall far short of those established in *Jenkins*. Sankey has established only that (1) she was the sole African American employee in a department of four and (2) during the August 1, 2022 meeting, Fields spontaneously stated Children's Hospital does not pay for discrimination. Absent additional evidence connecting this statement to Sankey's eventual termination for improper time entries, this comment is not sufficient to support a finding of discriminatory animus. *See Scott*, 295 F.3d at 1229.

When examining the record as a whole in the light most favorable to Sankey, the court finds she has failed to produce evidence that discriminatory intent played a role in Children's Hospital's decision to terminate her employment. Accordingly, the court will enter summary judgment in favor of Children's Hospital on Sankey's claim for race discrimination.

## B. Retaliation

In response to Children's Hospital's motion for summary judgment, Sankey stated she "does not oppose the dismissal of her retaliation claim in its entirety." (Doc. 26 at 15). However, a district court cannot enter summary judgment simply because the motion was unopposed but instead must consider the merits of the

motion. *See Dunlap v. Transamerica Occidental Life Ins. Co.*, 858 F.2d 629, 632 (11th Cir. 1988).[15]

Title VII prohibits an employer from discriminating against an employe because she has opposed an unlawful employment practice. 42 U.S.C. § 2000e-3(a). Consequently, an employer cannot retaliate against an employee who has complained about discrimination based on race or another protected characteristic. *See McCreight v. AuburnBank*, 117 F.4th 1322, 1339 (11th Cir. 2024). Like a discrimination claim, a plaintiff may prove retaliation with circumstantial evidence, both through the *McDonnell Douglas* framework or the convincing mosaic standard. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307, 1310 (11th Cir. 2023). Under either standard, a plaintiff must prove she engaged in statutorily protected conduct, she suffered an adverse employment action, and a causal connection between the two events. *Id.; McCreight*, 117 F.4th at 1339.

There is no evidence Sankey engaged in statutorily protected conduct before her termination, so she can meet neither the first nor third elements of a Title VII retaliation claim with respect to her termination. As to the appeal of her termination through Children's Hospital's administrative review process, Sankey cites no evidence suggesting the decision maker was aware of her comments regarding race

---

[15] In *Dunlap*, the plaintiff failed to file any response to the defendant's summary judgment motion. 858 F.3d at 631. Here, Sankey has affirmatively abandoned her retaliation claim. (Doc. 26 at 15). Nevertheless, the court will address the merits of Children's Hospital's motion.

discrimination during her termination meeting. Thus, as with her termination, she cannot show a causal connection between her opposition to race discrimination and the denial of her appeal. *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020) (finding no retaliation where there was no evidence decision maker was aware of the employee's protected conduct because temporal proximity alone does not create a genuine issue of fact as to causation). Accordingly, the court will enter summary judgment in favor of Children's Hospital on Sankey's retaliation claim.

## IV. Conclusion

For the foregoing reasons, Children's Hospital's motion for summary judgment is **GRANTED**. (Doc. 23). A separate order will be entered.

**DONE** this 24th day of March, 2026.

_____
STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE

30